**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

NICHOLAS RADOCESKY,              :

        **Plaintiff**              :

    **v.**                            :              **CIVIL ACTION NO. 3:CV-06-1073**

                      :

**MICHAEL J. ASTRUE[1],**              **(CALDWELL, D.J.)**
**Commissioner of**              :              **(MANNION, M.J.)**
**Social Security**

                      :

       **Defendant**              :

                      :

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("S.S.I."), under Title XVI of the Social Security Act, ("Act").  42 U.S.C. §§401-433, 1381-1383f.

## I.  PROCEDURAL HISTORY.

The plaintiff protectively filed an application for S.S.I. on June 25, 2003, alleging disability since December 16, 1999[2], due to organic brain syndrome,

---

[1]Michael J. Astrue became the Commissioner of Social Security effective February 12, 2007.  Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. §405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

[2]The court notes that the plaintiff had filed a previous application for S.S.I. on March 15, 2001.  That application was denied initially on June 18, 2001, and was not appealed by the plaintiff.  Therefore, any challenge to the
(continued...)

post concussion disorder, orthopedic difficulty, nerve damage, and motor skill problems. (TR. 80). The state agency denied his claims initially on November 6, 2003, (TR. 43-46).  The plaintiff filed a timely request for a hearing on November 14, 2003.   (TR. 47), and a hearing was held before an Administrative Law Judge, ("A.L.J."), on October 15, 2004.  (TR. 453-517). In addition to the plaintiff's testimony, the A.L.J. heard the testimony of Gerald Keating, a vocational expert, ("V.E.").  (TR. 453).  The plaintiff was denied benefits pursuant to the A.L.J.'s decision of November 17, 2004.  (TR. 17-26).

The plaintiff requested review of the A.L.J.'s decision on January 10, 2005.  (TR. 9).  The Appeals Council denied his request on April 26, 2006, thereby making the A.L.J.'s decision the final decision of the Commissioner. (TR. 6-8).

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Doc. Nos. 8, 12).

---

[2](...continued)
denial of disability though June 18, 2001, is barred by res judicata. 20 C.F.R. §416.1457(c)(1); See also Rogerson v. Secretary of Health and Human Servs., 872 F.2d 24, 29 (3d Cir. 1989) (recognizing the doctrine of administrative res judicata).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy"

3

means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).


## III. ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. *See* 20 C.F.R. §416.920. *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. 20 C.F.R. §416.920.

The first step of the process requires the plaintiff to establish that he has not engaged in "substantial gainful activity." 20 C.F.R. §416.920(b). The second step involves an evaluation of whether the plaintiff has a severe impairment. *See* 20 C.F.R. §416.920(c). The Commissioner must then determine whether the plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. §416.920(d). If it is determined that the plaintiff's impairments do not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the plaintiff has established that he is unable to perform his past relevant work. 20 C.F.R. §§416.920(e)-(f). The plaintiff bears the burden of demonstrating an inability

4

to return to his past relevant work. *Plummer*, 186 F.3d at 428.  Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the plaintiff is able to perform, consistent with his medically determinable impairments, functional limitations, age, education and work experience. 20 C.F.R. §§416.920(g), 416.960(c).  At this final step, the Commissioner is to consider the plaintiff's stated vocational factors. *Id.*

Here, the A.L.J. proceeded through each step of the sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act. (TR. 18-25).  At step one, the A.L.J. found that the plaintiff had not engaged in substantial gainful work activity since the protective date of his application of June 25, 2003.  (TR. 18).

At step two, the A.L.J. concluded that the plaintiff's impairments, including organic mood disorder, left pelvic fracture, and drug/alcohol abuse, were severe within the meaning of the Regulations.  (TR. 18).

At step three, the A.L.J. found that the plaintiff's impairments were not severe enough to meet or equal, either singly or in combination, the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4. Specifically, the A.L.J. considered Listing Sections 11.18, 12.02, and 12.09.  (TR. 18-19).

At step four, the A.L.J. found that the plaintiff was not able to perform his past relevant work in electronics and home repair, which was classified

as skilled in nature and heavy in exertional requirements.  Moreover, the A.L.J. found that the plaintiff could not perform his past relevant work as an office manager, which was classified as skilled, light work, or his job as a material handler/scheduler, which was classified as semi-skilled, medium work.  (TR. 20).

At step five, the A.L.J. found that the plaintiff had the residual functional capacity, ("R.F.C."), to perform a range of unskilled sedentary work which required only one-to-two step operations.  (TR. 20, 23).  The A.L.J. found that a significant number of jobs exist in the regional and national economy which the plaintiff could perform.  (TR. 25).  Thus, the A.L.J. concluded that the plaintiff was not disabled within the meaning of the Act.  (TR. 25).  20 C.F.R. §416.920(f).

## IV.  BACKGROUND.

### A.  Factual Background.

The plaintiff, forty-seven (47) years old at the time of the A.L.J.'s decision, was considered a younger individual under the Regulations.  20 C.F.R. §416.963.  The plaintiff has a high school education, having obtained a GED.  (TR. 86).  The plaintiff's work history includes employment as an electronics and home repairman, an office manager, and a material handler/scheduler.  (TR. 20, 100-07, 468-70).

At his hearing before the A.L.J., the plaintiff testified that he stopped

6

working in 1999 and received workers' compensation until 2001.  (TR. 474-75, 478).  During the years which the plaintiff did not have earnings records, he testified that he spent his time raising his family.  (TR. 486).

The plaintiff testified to a history of drug abuse beginning at the age of eight[3].  (TR. 486).  He testified that he was incarcerated for one year, from 2001-2002, for possession with intent to deliver.  He was then placed in a halfway house and treatment facility until March of 2004.  (TR. 479-82).

With respect to daily activities, the plaintiff testified that he wakes up between 5:30 a.m. and 6:00 a.m.  (TR. 488).  He prepares his own breakfast.  (Id.).  He gets his daughter off to school at approximately 8:00 a.m.  (TR. 489).  At around the same time, the plaintiff testified that his wife and son leave for work.  (Id.).  While home alone during the day, the plaintiff testified that he can wash, cook, and shop.  (TR. 490).  He testified that, as a hobby, he was putting together a notebook with business ideas, which consumed a lot of his time during the day.  (TR. 499). However, the plaintiff also testified that he does this in one-half hour increments due to problems with concentration.  (TR. 501).  The plaintiff testified that he is able to pay his own bills, as long as he actually receives a bill to remind him that it has to be paid.  (Id.).  The plaintiff testified that his vision prevents him from driving, but also indicated that his drivers' license is suspended.  (TR. 463-64).  He testified

---

[3]The A.L.J. found the plaintiff's drug/alcohol problem to be in remission.  (TR. 19).

that he goes to bed around 11:00 p.m., but only sleeps an average of four hours per night. (TR. 491). When he cannot sleep, the plaintiff testified that he sits around the table and listens to the radio. (Id.).

With respect to functional capacity, the plaintiff testified that he can stand for ten to fifteen minutes and then he has to sit down because of shaking in his legs due to nerve damage. (TR. 495). He testified that he does not feel secure on his feet. (Id.). Although he was prescribed a cane, the plaintiff does not use it to walk. (TR. 485). The plaintiff testified that he is always tired, and he naps two to three times per day for approximately one to one and one-half hours at a time. (TR. 496). The plaintiff testified that he can sit approximately one hour at a time without having to stand up or move around. (TR. 496). He testified that he experiences headaches, which makes him have to lie down. (Id.).

The plaintiff testified that he does not feel comfortable working in group settings, (TR. 500), and that he gets angry fast. (TR. 501).

With respect to medications, the plaintiff testified that he takes Allegra, Paxil and Buspar in the morning. (TR. 488). At night, he takes Trazodone and Buspar. (TR. 490). The plaintiff testified that he does not take narcotic pain medication because he is afraid he will get addicted. (TR. 497). The plaintiff is also prescribed Neurontin for headaches. (TR. 498).

A vocational expert, Gerald Keating, testified at the A.L.J. hearing. (TR. 502-06, 510-14). Based upon the evidence of record, the A.L.J. asked the

V.E. to hypothetically consider an individual with the same age, education and work background as the plaintiff, who had the physical residual functional capacity to perform sedentary work which required only one-to-two step operations.  The V.E. testified that such an individual could perform work as an assembler and packager, which existed in significant numbers in the state and national economies.  (TR. 25).

### B.  Medical Background.

The medical evidence, as summarized by the A.L.J. and supplemented by the plaintiff, establishes that on October 31, 1999, the plaintiff presented to the emergency room of Mercy Hospital in Scranton, Pennsylvania, with left-sided chest pain which was worse with breathing.  The plaintiff indicated that he was an active intravenous, ("IV"), drug user and last shot up approximately three days earlier.  (TR. 117-18).  The plaintiff signed out of the hospital against medical advice, but returned on the following day.  At that time, a chest x-ray revealed that the plaintiff had pneumonia and he was started on IV antibiotics.  The plaintiff was discharged on November 8, 1999.  (TR. 119-39).

On December 16, 1999, the plaintiff was involved in a motor vehicle accident, in which he sustained multiple abdominal and pelvic injuries, as well as a subdural hematoma and right frontal lobe contusion.  The plaintiff was initially treated at the Community Medical Center, Scranton, Pennsylvania,

and was later transferred to the Milton S. Hershey Medical Center on December 30, 1999, for treatment of his left pelvic fracture.  The plaintiff underwent a neurosurgery consultation to further work-up his head trauma and an orthopedic surgery consultation for treatment of his hip fracture.  A CT scan of the plaintiff's head indicated a right frontal contusion which was resolving.

On December 31, 1999, the plaintiff underwent an open reduction internal fixation of his left hip fracture.  The plaintiff was later advanced to foot flat non-weightbearing on his left lower extremity.

The plaintiff was discharged to rehabilitation on January 6, 2000, but was not transferred to John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania, until January 17, 2000, when bed space became available.  (TR. 140-201).  During his stay at John Heinz, the plaintiff remained stable.  His orientation improved and he was noted to be more focused.  The plaintiff was noted to be able to follow multi-step directions and was fluent in oral reading at the text level with retention of multiple details. It was noted that the plaintiff showed some impulsiveness and slower high level verbal and visual auditory processing.  However, it was indicated that his cognitive issues could be addressed on an outpatient basis.  The plaintiff was noted to be able to ambulate 100 feet with a standard walker and could navigate four stairs with minimal assistance.  The plaintiff was discharged on February 4, 2000, with initial home health therapies in the form of nursing,

physical therapy, occupational therapy, and speech.  (TR. 204-48).

On February 12, 2000, the plaintiff had an EMG/NCS study of both lower extremities, which was interpreted as showing evidence of mild to moderate demyelinating type of peripheral neuropathy, most likely consistent with diabetic neuropathy.  (TR. 408-12).  The plaintiff has not, however, been diagnosed with diabetes mellitus, and is not taking any diabetic medications. Clinical examinations have not shown any evidence of sensory deficits in the lower extremities.  (TR. 249-55, 347-50, 404-06).

On February 18, 2000, Terrence Duffy, M.D., a treating physician at the John Heinz Institute, completed an Employability Assessment Form for the Pennsylvania Department of Welfare, on which he opined that the plaintiff was temporarily disabled from December 17, 1999, to December 17, 2000, due to a traumatic brain injury and pelvic fracture.  (TR. 202-03).

On June 14, 2000, the plaintiff presented to the emergency room at Mercy Hospital, Scranton, Pennsylvania, after having experienced a grand mal seizure.  A CT scan of the head was unremarkable and an EEG was within normal limits.  At that time, the plaintiff admitted to having taken 15 Ultram on the day of admission prior to the seizure and using heroin intravenously.  (TR. 249-55).

On June 25, 2000, the plaintiff again presented to the Mercy Hospital emergency room after having been thrown out of a car while he was drunk. A CT scan of the head was unremarkable, and cervical spine and chest x-

rays were normal.  The plaintiff tested positive for cocaine opiates and alcohol usage.  (TR. 256-60).

On August 6, 2000, the plaintiff presented to the Mercy Hospital emergency room complaining of left flank pain.  He was found to have kidney stones.  The plaintiff declined medical treatment at that time, but returned to the emergency room on August 30, 2000, with abdominal pain.  It was noted that the plaintiff became upset when the emergency room physician refused to give him narcotic pain medication.  He was noted to pull out his IV and swing it around the room.  Ultimately, security was called and escorted the plaintiff out of the hospital.  (TR. 267-70).

On November 11, 2000, the plaintiff presented to the emergency room of the Community Medical Center after experiencing a grand mal seizure.  He was placed on observational status and evaluated by neurology.  No further seizures were noted.  An MRI of the plaintiff's head indicated a right frontal region scar.  A CT scan showed no evidence of encephalomalacia[4].  It was noted that the plaintiff was uncooperative during EEG testing.  He was discharged on November 15, 2000.  (TR. 276-79).

On March 20, 2001, Paul Remick, M.D., the plaintiff's treating physician, completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare on which he indicated that the

------

[4]Cerebral softening.  Taber's Cyclopedic Medical Dictionary at 669 (19th ed.  2001).

12

plaintiff was permanently disabled due to a cerebral hemorrhage.  Dr. Remick checked boxes indicating that his assessment was based upon physical examination, review of medical records, clinical history, appropriate tests and diagnostic procedures, and "other", although he failed to indicate what "other" factors his assessment was based upon.  (TR. 280-81).

On April 2, 2001, the plaintiff presented to the emergency room at Mercy Hospital with complaints of hip and pelvic pain.  An x-ray of the pelvis showed no evidence of avulsion fracture or lytic lesions.  The plaintiff was given Demerol, Motrin and Percocet for pain.  Dr. Remick was contacted, who recommended that the plaintiff not be given any narcotic pain medications due to his long history of IV drug use and narcotic abuse.  The plaintiff refused an abdominal CT scan, and was discharged home with a prescription for Toradol.  (TR. 282-83).

The plaintiff was subsequently incarcerated, during which time he was noted to have difficulty managing anxious and depressive emotions.  He was treated with Buspar, Zoloft, and Trazodone.  The plaintiff was released on June 2, 2004, to dual diagnosis treatment at the Keenan House in Allentown, Pennsylvania.  (TR. 298-341).

On September 17, 2003, the plaintiff underwent a consultative internal medicine evaluation with Thomas Minora, M.D.  At that time, he complained of chronic headaches, word finding problems, poor motor skills, mood swings, anxiety, insomnia, forgetfulness, and difficulty walking.  Upon

examination, Dr. Minora noted that the plaintiff walked with a wide-based gait, but had good motor strength bilaterally and 5/5 strength in the upper and lower extremities.   No sensory or reflex abnormalities were noted.   The plaintiff was found to have a draining abscess on his abdomen, for which it was recommended that he see his family physician.  The plaintiff underwent a mini-mental status examination, during which he was noted to have difficulty counting backwards from 100.  He also had difficulty spelling the word "world" backwards, and was noted to seem to be searching for words. Dr. Minora opined that the plaintiff was capable of performing sedentary work.  (TR. 347-50).

On September 22, 2003, the plaintiff underwent a consultative psychiatric evaluation with Ashokkumar Patel, M.D.  At that time, the plaintiff reported that he was living in a group home.  He denied any history of psychiatric hospitalizations or suicide attempts.  He reported poor concentration and attention.  He further indicated that he is forgetful.  Upon examination, Dr. Patel noted that the plaintiff was alert, oriented, and seemed to be reliable in providing his history.  The plaintiff was able to give his name, address and social security number. The plaintiff's recent and remote memory was noted to be good.  The plaintiff denied current hallucinations, and suicidal or homicidal thoughts.  At that time, the plaintiff indicated that he was not receiving any psychiatric treatment.   The plaintiff's hygiene was noted to be good and his eye contact fair.  His affect was appropriate and his

mood was anxious.  The plaintiff was noted to have fair insight and judgment.
Dr. Patel diagnosed the plaintiff with an organic mood disorder by history,
and opined that the plaintiff would have no difficulty understanding,
remembering and carrying out short, simple instructions and interacting with
the public, supervisors and co-workers.  Dr. Patel opined that the plaintiff had
a slight limitation in his ability to respond appropriately to work pressures in
both a usual and routine work setting, and to make judgments on simple
work-related decisions, and slight to moderate limitations in his ability to
understand, remember and carry out detailed instructions.  (TR. 351-55).

   In September of 2003, the plaintiff began treating with V.D. Dhaduk,
M.D., a neurologist.  Upon examination on September 29, 2003, Dr. Dhaduk
found subtle left-sided upper motor neuron signs, with deep tendon reflexes,
slightly brisker on the left as compared to the right.  The plaintiff's pupils were
equal and reactive to light.  No acute papilledema[5] was noted.  Mild
nystagmus[6] was noted.  Romberg's test was negative.  The plaintiff's gait
was noted to be fairly steady and no focal sensory deficit was noted.
Diminished attention span and generalized weakness were noted.  The

---

[5]Edema and inflammation of the optic nerve at its point of entrance into
the retina.  It is caused by increased intracranial pressure, often due to a
tumor of the brain pressing on the optic nerve.  Taber's Cyclopedic Medical
Dictionary at 1504 (19th ed.  2001).

[6]Involuntary back and forth or cyclical movements of the eyes.  Taber's
Cyclopedic Medical Dictionary at 1426 (19th ed.  2001).

plaintiff's speech was noted to be slightly dysarthric and he was noted to have significant dullness of the higher cortical functions. An MRI of the plaintiff's head showed encephalomalacia with small chronic hemorrhage in the right frontal region, but was otherwise unremarkable. Dr. Dhaduk diagnosed the plaintiff with post-traumatic dementia causing significant impairment of the cognitive functions, rule out pseudodementia; depression; vascular headaches; and history of serious head trauma with right frontal hemorrhage and craniotomy. Dr. Dhaduk prescribed Aricept and ordered an EEG and blood tests. (TR. 405-06).

On December 29, 2003, Dr. Dhaduk noted that the plaintiff's gait was minimally unsteady and his speech was mildly dysarthric. EEG testing on January 20, 2004, was normal with no evidence of focal slowing or epileptogenic activity. (TR. 408-12).

In August of 2004, the plaintiff began cognitive rehabilitation therapy at Allied Rehabilitation Center under the direction of John R. Harvey, Ph.D., a psychologist, and Jody Lapinski, M.S., a cognitive therapist. (TR. 413-34). Upon examination, the plaintiff was diagnosed with an organic brain/personality disorder, depression, anxiety disorder and cognitive impairments. Both Dr. Harvey and Ms. Lapinski noted that the plaintiff had difficulty with his memory, difficulty with word finding and problems with becoming irritable when frustrated. (Id.).

On August 12, 2004, Dr. Remick completed a Physical Functional

16

Capacity Evaluation form, on which he indicated that the plaintiff had the ability to stand and walk for one hour in an eight hour workday and sit for two hours in an eight hour workday.  (TR. 401-03).

On October 14, 2004, Ms. Lapinski completed a Mental Residual Functional Capacity Assessment form, on which she indicated that, since at least May 19, 2004, the plaintiff had moderate to severe impairments in his abilities to remember, understand tasks, concentrate and persistence to perform tasks.  Ms. Lapinski indicated that the plaintiff would be the type of person where a routine, repetitive, simple, entry-level job would serve as a stressor, which would exacerbate psychological symptoms rather than mitigate stress in the workplace.  (TR. 413-14).

## V.  DISCUSSION.

Initially, the plaintiff challenges the decision of the A.L.J. arguing that the A.L.J. erred in ignoring the office notes, clinical findings, diagnoses, and Mental Functional Capacity Assessment form of Dr. Dhaduk, his treating neurosurgeon, which diagnosed him as suffering from significant cognitive impairment due to a traumatic brain injury and opined that he has a medically/psychologically determinable impairment that severely affects his cognitive functioning relating to memory, concentration and social interactions.  The plaintiff argues that Dr. Dhaduk's diagnosis is based upon medically acceptable clinical and diagnostic testing, namely an MRI of the

17

plaintiff's head which showed encephalomalacia with chronic hemorrhagic component in the right frontal lobe. (TR. 411-12). Based upon this, the plaintiff argues that Dr. Dhaduk reasonably opined that he did not have the residual functional capacity to engage in substantial gainful employment. The plaintiff argues that Dr. Dhaduk's opinion is consistent with the opinion of Dr. Terrence Duffy, an independent treating physician at John Heinz Institute; Dr. Remick, the plaintiff's treating physician; and Ms. Lapinski, the plaintiff's treating cognitive therapist.

With respect to the Mental Residual Functional Capacity Assessment completed by Dr. Dhaduk, at the plaintiff's hearing before the A.L.J., the A.L.J. left the record open for ten days to await additional evidence in the form of notes from Ms. Lapinski. (TR. 515). There is no indication from the record that the plaintiff included Dr. Dhaduk's assessment to the A.L.J. The plaintiff has attached Dr. Dhaduk's assessment to her appellate brief, which indicates that it was completed on October 15, 2004, the date of the hearing, and faxed at 2:23 p.m., after the plaintiff's hearing had concluded. (Doc. No. 8, Attachment). Because there is no indication that Dr. Dhaduk's assessment was included in the record before the A.L.J., the court cannot now consider that evidence as part of our review. *See Matthews v. Apfel,* 239 F.3d 589, 594 (3d Cir. 2001) (evidence not presented to the A.L.J. "cannot be used to argue that the A.L.J.'s decision was not supported by substantial evidence") (internal citations omitted).

Moreover, although the A.L.J. must consider all medical opinions, the better an explanation a source provides for an opinion, particularly through medical signs and laboratory findings, the more weight the A.L.J. will give that opinion. 20 C.F.R. §416.927(d)(3). While treating physicians' opinions may be given more weight, there must be relevant evidence to support the opinion. 20 C.F.R. §416.927(d). Automatic adoption of the opinion of the treating physician is not required. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

To the extent that the plaintiff argues that the A.L.J. did not consider the findings of Dr. Dhaduk, the record shows otherwise. (TR. 18, 23). There is no indication from Dr. Dhaduk's records, however, that the plaintiff had disabling functional limitations which would prevent him from engaging in any substantial gainful work activity.

With respect to the plaintiff's argument that Dr. Dhaduk's assessment is consistent with other evidence in the record, including the assessments of Dr. Duffy and Dr. Remick, the forms to which the plaintiff refers are forms completed for the Pennsylvania Department of Welfare. As such, they are not medical opinions and are not binding on the Commissioner. *See* 20 C.F.R. §§416.904, 416.927(a)(2). *See also Coria v. Heckler*, 750 F. 2d 245, 247 (3d Cir. 1994). Moreover, this evidence is weak, at best, to support a claim of disability under the Act. *See Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993)( "Form reports in which a physician's obligation is only to check a

box or fill in a blank are weak evidence at best.").

Finally, to the extent that the plaintiff argues that Dr. Dhaduk's assessment is supported by the R.F.C. assessment of Ms. Lapinski, the final responsibility for determining a plaintiff's residual functional capacity is reserved for the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §§416.927(e)(2), (3). At the hearing level, the responsibility for determining a plaintiff's residual functional capacity is reserved for the A.L.J. 20 C.F.R. §416.946. Moreover, the A.L.J. may properly afford less weight to an assessment not accompanied by supporting findings. See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986)(where R.F.C. assessment is not accompanied by a thorough written report, its reliability is suspect).  Here, Ms. Lapinski's assessment was more restrictive than that of Dr. Dhaduk.  However, her assessment was not accompanied by any supporting written report.

Based upon the foregoing, the plaintiff's argument that the A.L.J. erred in ignoring the office notes, clinical findings, diagnoses, and Mental Functional Capacity Assessment form of Dr. Dhaduk is without merit, and the plaintiff's appeal should be denied on this basis.

Next, the plaintiff argues that the A.L.J. erred in rejecting the March 20, 2001, and August 12, 2004, reports of Dr. Remick, in which he opined that the plaintiff has been totally disabled since 2002, when his cognitive deficits failed to improve.  The plaintiff notes that these reports were not afforded

great weight because Dr. Remick's office notes were not included in the record.  While the plaintiff admits that  Dr. Remick's notes were not provided, he argues that Dr. Remick's conclusion is consistent with other medical evidence in the record.  Specifically, the plaintiff argues that Dr. Remick's conclusion is consistent with the opinions of Dr. Dhaduk and Ms. Lapinski.

Under the Regulations, the A.L.J. was entitled to afford the report of Dr. Remick less weight based upon the plaintiff's failure to provide any corresponding treatment notes and supporting objective findings.  *See* 20 C.F.R. §§416.904, 416.927(e)(2).  Therefore, the plaintiff's appeal should be denied on this basis as well.

The plaintiff similarly argues that the A.L.J. erred in failing to give proper weight to the assessment of Ms. Lapinski.  Again, the A.L.J. is permitted to weigh all evidence against other evidence in the record and afford each opinion appropriate weight depending on the support provided for the opinion and the consistency of the opinion with the record as a whole. See 20 C.F.R. §§416.904, 416.927(d)(2).  It is in the A.L.J.'s discretion to choose which evidence to credit, as long as the A.L.J. does not reject evidence "for no reason or for the wrong reason." *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  Here, the A.L.J. concluded that Ms. Lapinski's assessment was not supported by informative, supportive or corroborating medical records.  His finding is consistent with the Regulations

and the law of the Third Circuit[7].  As such, the plaintiff's appeal should be denied on this basis.

Finally[8], the plaintiff argues that the A.L.J. erred in failing to provide a reasonable basis for finding that he did not suffer from a listed impairment or an impairment or combination of impairments which met or equaled a listing.

It is the plaintiff's burden to prove that his condition meets or equals the specific clinical requirements of a listed impairment before he can be considered to be disabled *per se* without consideration of vocational factors, such as age, education, and work experience. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citations omitted).  To be entitled to disability benefits, a claimant must show that all, not just some, of the criteria for a listing are met. *Zebley*, 493 U.S. at 530.  The Commissioner must make the legal determination as to whether an impairment meets or equals a listing. *See* 20 C.F.R. §416.927(e)(1) and (2).  The court finds that there is substantial evidence to support the A.L.J.'s finding that the plaintiff was not suffering from a listed impairment at any time through the date of the A.L.J.'s decision.

---

[7]The court further notes that the A.L.J. was not required to give Ms. Lapinski's opinion any particular deference, as she is not an acceptable medical source under the Regulations.  20 C.F.R. §416.913; Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1999).

[8]The court notes that the plaintiff had raised an issue with respect to the A.L.J.'s assessment of his subjective complaints.  Because that issue was not briefed by the plaintiff, it will not be addressed herein.

The plaintiff argues that he meets the requirements of Listing 11.18, cerebral trauma, which the Regulations require be evaluated under the provisions of 11.01, 11.03, 11.04 and 12.02, as applicable. The plaintiff argues that listing 12.02[9], organic mental disorder, is the appropriate

---

[9]Listing 12.02 provides:

12.02 Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

(continued...)

23

_____

[9](...continued)

6. Emotional ability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal

(continued...)

24

provision under which to evaluate him with respect to listing 11.18.  There is no dispute that the A.L.J. found that the plaintiff exhibits some of the features of the "A" criteria in 12.02.  However, the A.L.J. found that the plaintiff did not meet the functional limitations set forth in the "B" criteria.  To this extent, the plaintiff argues that the record demonstrates that he experiences restrictions in his daily activities, social activities and has difficulties in maintaining concentration, all of which fulfills the listed impairment's requirements under the "B" criteria.

Specifically, under the first "B" criteria, the plaintiff argues that the A.L.J. misstated his testimony with respect to his activities of daily living. Here, as noted above, while the plaintiff testified that he can stand only ten to fifteen minutes and sit about one hour without difficulty, he also testified that he wakes up between 5:30 a.m. and 6:00 a.m; he prepares his own breakfast; he gets his daughter off to school at approximately 8:00 a.m.; while home alone during the day, he can wash, cook, and shop; and as a hobby, he was putting together a notebook with business ideas, which consumed a lot of his

---

[9](...continued)
adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

time during the day.   Therefore, the A.L.J.'s finding that the plaintiff's psychological impairment results in only a mild restriction of his daily activities is supported by substantial evidence in the record.

With respect to the second "B" criteria, which addresses social functioning, the plaintiff argues that the A.L.J. ignored the R.F.C. assessments of Dr. Dhaduk and Ms. Lapinski, who both opined that he is moderately to severely impaired in most of the areas of social interaction.  In addition, the plaintiff argues that the A.L.J. failed to consider the letter from his supervisor at St. Francis of Assisi's Soup Kitchen, who indicated that, due to his "odd and somewhat aggressive behaviors, it was necessary to terminate his volunteering assistance."   Finally, the plaintiff argues that the A.L.J.'s finding contradicts his testimony that he cannot be around people, does not appropriately get along with others and is not able to control his outbursts of anger.

Initially, evidence in the form of a letter from the plaintiff's supervisor at the St. Francis kitchen is lay evidence, not medical evidence.  To the extent that the information provided in the letter conflicts with the medical evidence of record, it is within the discretion of the A.L.J. to determine what weight it should be afforded.   *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Therefore, it was not reversible error for the A.L.J. not to afford this letter any significant weight.

Moreover, although the plaintiff cites to the assessments of Dr. Dhaduk

26

and Ms. Lapinski, and to his own testimony at the hearing before the A.L.J., to indicate that he has severe limitations in the area of social functioning, on August 26, 2003, the plaintiff completed a questionnaire on which he indicated that he did not have any problems getting along with people in authority, and indicated that he played cards with relatives and friends as often as possible.  In addition, he indicated that he did not have difficulty going out in public and that he had never been in fights, evicted, or fired.  Therefore, there is significant evidence in the record to support the A.L.J.'s finding that the plaintiff had no more than mild to moderate limitation in the area of social functioning.

Finally[10], with respect to the third "B" criteria, which addresses concentration, persistence, or pace, the plaintiff argues that the A.L.J. erred in relying solely on the opinion of Dr. Patel, the consultative physician, which contradicts the assessments of Dr. Dhaduk and Ms. Lapinski.  In addition, the plaintiff alleges that the A.L.J. misstated his testimony with respect to his ability to pay bills.

With respect to this criteria, the record supports the A.L.J.'s findings with respect to the plaintiff's testimony that he can pay his own bills, that he enjoyed reading electronics publications, and that, while incarcerated, he

---

[10]The court notes that the plaintiff does not challenge the A.L.J.'s finding with respect to the fourth "B" criteria relating to episodes of decompensation, demonstrated by an exacerbation of symptoms or signs that ordinarily require increased treatment and/or a less stressful episode.

27

worked on a marketing research plan for a product improvement. The plaintiff further testified that he works on a notebook with business ideas on a daily basis in one-half hour increments. Thus, substantial evidence supports the A.L.J.'s finding that the plaintiff has no more than a moderate limitation in maintaining concentration, persistence, or pace.

Based upon the foregoing, the plaintiff's argument that the A.L.J. erred in failing to provide a reasonable basis for finding that he did not suffer from a listed impairment or an impairment or combination of impairments which met or equaled a listing is without merit, and the plaintiff's appeal should be denied.

## VI. RECOMMENDATION.

Based on the foregoing, it is recommended that the Plaintiff's appeal of the decision of the Commissioner of Social Security be **DENIED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:** August 1, 2007
O:\shared\REPORTS\2006 Reports\06-1073.01.hhs.wpd

28